UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
KEWAZINGA CORP.,                                               :
                                                               :
                                        Plaintiff,             :
                                                               :
                    -against-                                  :
                                                               :
MICROSOFT CORPORATION                                          :
                                        Defendant.             :
                                                               :
-------------------------------------------------------------- X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 9/1/2021 |

1:18-cv-4500-GHW

<u>MEMORANDUM OPINION &
ORDER</u>

GREGORY H. WOODS, United States District Judge:

Plaintiff Kewazinga Corp. ("Kewazinga") initiated this patent infringement action against

Microsoft Corporation ("Microsoft"). The complaint alleges that Microsoft has infringed on three

of Kewazinga's patents which teach telepresence systems, devices, and methods that enable one or

more users to navigate imagery through a remote environment. The parties have each moved for

summary judgment. In their respective motions and oppositions, the parties rely on the testimony

of their expert witnesses. The parties unsurprisingly seek to exclude testimony and opinions from

the opposing party's experts. Those arguments are the subject of this decision. Kewazinga seeks to

exclude the testimony and opinions of Microsoft's technical expert, Dr. Forsyth, and Microsoft's

damages expert, Dr. Meyer. Microsoft seeks to exclude portions of the testimony and opinions of

Kewazinga's technical expert, Dr. Hanna, and Kewazinga's damages expert, Ms. Riley, and to

exclude the opinions of Mr. Smith, Kewazinga's expert on search engine marketing. For the reasons

that follow, Kewazinga's motion is granted in part and denied in part. Microsoft's motion is also

granted in part and denied in part.

## I.      BACKGROUND

This case is about three patents for navigable presence technology.  Kewazinga alleges that Microsoft's Streetside imagery infringes on its patents.  Microsoft seeks a declaratory judgment that Kewazinga's patents are invalid and that Microsoft has not infringed on Kewazinga's patents.

Before the Court are the parties' July 18, 2020 motions to exclude the testimony of the opposing party's expert witnesses.  Dkt. Nos. 193, 203; see Dkt. Nos. 194 ("Kewazinga's Mot.); 205 ("Microsoft's Mot.").  Kewazinga moves to exclude testimony from two of Microsoft's experts:  (1) Dr. David Forsyth, Microsoft's technical expert; and (2) Dr. Christine Meyer, Microsoft's damages expert.  Microsoft moves to exclude testimony from three of Kewazinga's experts:  (1) Dr. Keith Hanna, Kewazinga's technical expert; (2) Michele Riley, Kewazinga's damages expert; and (3) William Smith, Kewazinga's expert on search engine marketing.  Oppositions were submitted on August 20, 2020.  Dkt. Nos. 242 ("Microsoft's Opp."), 255 ("Kewazinga's Opp.").  The parties replied on September 3, 2020.  Dkt. Nos. 273 ("Kewazinga's Reply"), 285 ("Microsoft's Reply").

The Court assumes the reader's familiarity with the facts in this case, which are set forth in more detail in the Court's opinion on the parties' motions for summary judgment.

## II.     LEGAL STANDARD

Under Federal Rule of Evidence 702, an expert who is "qualified . . . by knowledge, skill, experience, training, or education may testify" if the testimony would be helpful to the trier of fact, "is based on sufficient facts or data," "is the product of reliable principles and methods," and the expert has reliably applied these principles and methods to the facts of the case.[1]  The "proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."[2]  Rule 702 "imposes a special obligation upon a

---

[1] Fed. R. Evid. 702.
[2] *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

2

trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"[3]  The court must determine whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[4]

The first step in evaluating a motion to exclude is determining "whether the expert has sufficient qualifications to testify."[5]  If so, the second "question is 'whether the proffered testimony has a sufficiently reliable foundation.'"[6]  It is "critical that an expert's analysis be reliable at every step," for "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible."[7]  To determine the reliability of the testimony, the Court may consider factors including:

> (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.[8]

Any contentions that the expert's "assumptions are unfounded go to the weight, not the admissibility, of the testimony."[9]  The Court need not exclude testimony because of a "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method."[10]  But "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[11]

---

[3] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)); *see also Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (the court serves an initial gatekeeping function of weeding out "junk science").

[4] *Kumho Tire*, 526 U.S. at 152.

[5] *Davis*, 937 F. Supp. 2d at 412 (internal quotation marks omitted).

[6] *Id.* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

[7] *Amorgianos*, 303 F.3d at 267 (internal quotation omitted) (emphasis in original).

[8] *Id.* at 266 (quoting *Daubert*, 509 U.S. at 593–94 (internal citations and quotation marks omitted)).

[9] *Boucher v. U.S. Suzuki Motor Corp.*, 73 F. 3d 18, 21 (2d Cir. 1996) (*quoting Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir.), *cert. denied*, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992)).

[10] *Amorgianos*, 303 F.3d at 267.

[11] *Gen Elec. Co. v. Joiner*, 522 U.S. 136, 146. (1997).

Because "the gatekeeping inquiry must be tied to the facts of a particular case,"[12] the "*Daubert* inquiry is fluid and will necessarily vary from case to case."[13]  The "formality of a separate hearing" is not always required for a district court to "effectively fulfill[] its gatekeeping function under *Daubert*."[14]  Furthermore, the analysis is not limited to Rule 702.  "Expert testimony must also adhere to the other Federal Rules of Evidence, including Rule 403, which provides that relevant evidence may still be excluded 'if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'"[15]

The Federal Rules of Evidence govern the admissibility of evidence.  Under Rule 402, evidence must be relevant to be admissible.[16]  The "standard of relevance established by the Federal Rules of Evidence is not high."[17]  If the evidence "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action," it is relevant.[18]  Nonetheless, under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[19]

The Second Circuit has instructed that "[d]istrict courts have broad discretion to balance probative value against possible prejudice" under Rule 403.[20]  Because virtually all evidence is

---

[12] *Kumho Tire*, 526 U.S. at 150 (internal quotation marks omitted).
[13] *Amorgianos*, 303 F.3d at 266.
[14] *Williams*, 506 F.3d at 161.
[15] *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 364 F. Supp. 3d 291, 325 (S.D.N.Y. 2019) (quoting Fed. R. Evid. 403).
[16] Fed. R. Evid. 402.
[17] *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985) (quoting *Carter v. Hewitt*, 617 F.2d 961, 966 (3d Cir. 1980) (internal quotation marks omitted).
[18] Fed. R. Evid. 401.
[19] Fed R. Evid. 403.
[20] *United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008) (citation omitted).

prejudicial to one party or another, to justify exclusion under Rule 403 the prejudice must be *unfair*.[21] "The unfairness contemplated involves some adverse effect beyond tending to prove a fact or issue that justifies admission."[22]  Further, as the advisory committee notes to Federal Rule of Evidence 403 explain, "'[u]nfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[23]

## III.   Kewazinga's Motion to Exclude

Kewazinga challenges the opinions of Dr. Forsyth and Dr. Meyer, arguing that they have provided unreliable opinions that fail to satisfy Rule 702's requirements.  For the reasons set forth below, Kewazinga's motion is granted in part and denied in part.

### A.   Request to Exclude Testimony and Opinions from Dr. Forsyth

Kewazinga challenges Dr. Forsyth's opinions, asserting that they are based on positions that conflict with the Court's construction of different claim terms.  "Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial. No party may contradict the court's construction to a jury."[24]  "Where expert testimony is in fact inconsistent with a court's claim construction, it should be excluded under the *Daubert* standard [as unreliable, irrelevant, unhelpful, and confusing to the jury]."[25]  For the following reasons, Kewazinga's motion to exclude Dr. Forsyth's opinions is granted in part and denied in part.

---

[21] *See* Fed. R. Evid. 403; Weinstein's Federal Evidence § 403.04[1][a] (2019) (citing cases).

[22] *Costantino v. David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174–75 (2d Cir. 2000).

[23] Fed. R. Evid. 403 advisory committee's note to 2011 amendments.

[24] *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009).

[25] *Integra Lifesciences Corp. v. HyperBranch Med. Tech., Inc.*, 2018 WL 1785033, at *4 (D. Del. Apr. 4, 2018); *see also Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (affirming the exclusion of expert opinion evidence as irrelevant when it was based on an impermissible claim construction and risked prejudicing and confusing the jury).

### 1.   Dr. Forsyth's Opinions on Tweening

Kewazinga argues that Dr. Forsyth's non-infringement opinions should be excluded to the extent they rely on limitations to "tweening" that contradict the Court's construction of the term.[26]

### a)   Discrete and Realistic Viewpoints

First, Kewazinga argues that Dr. Forsyth has impermissibly added requirements to the definition of tweening by opining that "Dr. Hanna's contentions are flawed at least because Streetside clients have never been configured to generate or utilize synthetic imagery between acquired imagery under the Court's claim construction of tweening" and they "*never generate or utilize synthetic imagery depicting viewpoint(s) in-between the real camera viewpoints, as required by the Asserted Patents under the Court's construction of tweening.*"[27]  Kewazinga further argues that Dr. Forsyth impermissibly narrows the tweening definition by concluding that "the synthetic imagery generated by tweening should 'realistically depict the environment from viewpoint(s) located in-between the real camera viewpoints used in capturing real camera viewpoints[.]"[28]  In essence, Kewazinga objects to Dr. Forsyth's reliance on an assumption that tweening "requires that the synthetic imagery depict discrete viewpoints . . . realistically" in reaching his non-infringement conclusions.[29]

The Court construed the term "tweening" as "generating synthetic imagery from acquired imagery, and utilizing that synthetic imagery between the acquired imagery, in order to show movement and transition between the acquired image[]."[30]  In doing so, the Court expressly rejected Microsoft's proposal that "tweening" be narrowed to require the creation of an interpolated image, explaining that the limitation would be in tension with the specifications of the '234 and '325 patents.[31]

---

[26] Kewazinga's Mot. at 2.
[27] *Id.* at 3 (citing Ex. 2, Forsyth Rebuttal Report ¶ 427) (emphasis in original).
[28] *Id.* (citing Ex. 2, Forsyth Rebuttal Report ¶ 428).
[29] *Id.* at 3–4.
[30] Claim Constr. Op. at 21.
[31] *Id.* at 21–22.

Given the Court's construction of "tweening," Kewazinga's objection as to this issue is valid: Dr. Forsyth's understanding of tweening adds limitations not required by the Court's construction. Nowhere in the Court's construction did it require that the tweened imagery represent specific discrete viewpoints between the acquired imagery, or that the synthetic imagery realistically depict the viewpoints. The Court only construed tweening as requiring that the synthetic imagery "show movement and transition between the acquired imagery."[32] During the claim construction phase, Microsoft raised a similar argument, and sought to narrow the construction by adding a requirement that tweening must involve the use of local scene characteristics to show movement. Microsoft broadens its prior approach here, but the two arguments are cut from the same cloth. The position has already been rejected by the Court, as it clearly runs contrary to the different claims asserted in the '234 patent.[33] This impermissible construction risks confusing the jury, as it could lead them to believe that tweening has additional requirements that it does not. Accordingly, Kewazinga's motion is granted as to this issue.

### b)      Warping

Next, Kewazinga challenges Dr. Forsyth's opinion that the Silverlight client and the Windows Maps App do not satisfy the tweening limitations because they do not perform a warping process.[34] Kewazinga argues that in arriving at those conclusions, Dr. Forsyth applied a narrower definition of warping than the one used by Kewazinga in its infringement contentions and Dr. Hanna in his reports and which contradicts the court's construction of tweening.[35]

Although the Court's construction of tweening does not impose a warping requirement, warping does appear in the specification in the '325 Patent as a part of the tweening process:

---

[32] *Id.* at 21.

[33] *See id.* at 25–26 (explaining that Microsoft's proposal would render Claim 7 of the '234 patent surplusage).

[34] Kewazinga's Mot. at 5–6; *see, e.g.*, Dkt. No. 217-1 ("Forsyth Rebuttal Report") ¶ 439–43 ("Because Dr. Hanna's theory of tweening is based on this (incorrect) assumption that the Maps App performs *warping*, Dr. Hanna has failed to meet his burden to show that the Maps App performs 'tweening' during the transition from one bubble to the next").

[35] Kewazinga's Mot. at 6.

"[w]arping one of the outputs towards the other output using the current estimates of the models at the given image resolution."[36]   And, as Microsoft points out, the only tweening process disclosed by Kewazinga's infringement contentions is one that required "warping imagery."  Thus, Dr. Forsyth's testimony regarding warping is key to the ultimate question of infringement.  During the claim construction process, the Court considered the parties' proposed constructions of the term "warping imagery" and rejected both.[37]   Kewazinga argued that the term did not need construction, and alternatively proposed that the term be construed as "transforming the positions of pixels in imagery."[38]  Microsoft proposed that "warping imagery" be construed as "modifying an image captured at one camera location to bring the image closer to matching another image captured at a different camera location."[39]  The Court concluded that the term "warping imagery" was to be given its full ordinary meaning and construed as "warping imagery."[40]

In Dr. Forsyth's rebuttal report, he explained that warping did not occur in the Windows Maps App because the Maps App uses a texture mapping technique to animate the transition between locations.  According to Dr. Forsyth, the Maps App client projects textures from each of the beginning and end cubes and blends the projections together using an overlaying and cross-fading process that in some places results in distorted imagery, but that distortion does not necessarily mean that warping has occurred, as Dr. Hanna had concluded in his report.[41]  Similarly, Dr. Forsyth also opines that because the Silverlight client demonstrates movement through opacity mixing or cross-fading, Dr. Hanna failed to show warping occurred, which undermines his opinion on tweening.[42]  Dr. Forsyth also highlights that Dr. Hanna did not explain or point to any evidence

---

[36] *See* Claim Constr. Op. at 40; .325 Patent, 14:18–20.
[37] Claim Constr. Op. at 39–40.
[38] *Id.* at 39.
[39] *Id.* at 39.
[40] *Id.* at 41.
[41] Dkt. No. 217-1 ("Forsyth Rebuttal Report") ¶¶ 439, 442–43.
[42] *Id.* ¶¶ 449–56.

to support his conclusion that warping had occurred during the transition, whereas "[a] POSITA would have known that there are ways to create distortions that use warping and ways that do not use warping."[43]  Dr. Forsyth concluded that Dr. Hanna's conclusions that the Silverlight client and Windows Maps application performed a tweening process were technically inadequate.[44]

The issue here is not whether Dr. Forsyth's opinions contradict the Court's construction of tweening, as Kewazinga frames it.  Dr. Forsyth is challenging the only infringement contention regarding tweening that Kewazinga disclosed, which was one that required warping.  And Dr, Forsyth's evaluation of Dr. Hanna's conclusions regarding whether the Silverlight client and Windows Maps App used a warping process are not inconsistent with Court's construction of "warping imagery."  That Dr. Forsyth and Dr. Hanna offer opposing views on whether the accused instrumentalities engaged in a warping process is not a basis for exclusion.  Furthermore, Kewazinga makes much of Dr. Forsyth interpreting the term "warping" differently than the way Kewazinga and Dr. Hanna used the term during the claim construction phase.  Regardless of the broad definition that Kewazinga put forth in the claim construction proceedings, the Court did not adopt either of the parties' proposed constructions.

Accordingly, Kewazinga's motion is denied as to this issue.

c)  **Acquired Imagery**

Kewazinga also challenges Dr. Forsyth's interpretation of the term "acquired imagery" as used in the Court's construction of "tweening."[45]  In construing the term "tweening" as "generating synthetic imagery from acquired imagery, and utilizing that synthetic imagery between the acquired imagery, in order to show movement and transition between the acquired imagery," the Court rejected Microsoft's proposal that tweening require "images captured at different camera

---

[43] *Id.* ¶¶ 455–56.
[44] Forsyth Rebuttal Report at ¶ 456.
[45] Kewazinga's Mot. at 6 n.2.

locations."[46]  The Court explained that Microsoft's proposal was contradicted by the plain language of Claim '11 of the '325 Patent, which specifically allowed for tweening of non-camera source outputs.[47]

In the current dispute, Kewazinga argues that the beginning and ending bubble images in the accused Streetside clients are acquired imagery, even if the raw image data was processed to form the initial bubbles.  In contrast, Dr. Forsyth has opined that the bubbles are not acquired imagery because the raw image data is subject to processing prior to display, resulting in images that could not have been captured by any existing camera or a camera that existed at that time.

During his deposition, Dr. Forsyth testified that he understood acquired imagery to mean "images that have been acquired as opposed to created, and if they have been acquired, they have been acquired from some form of image sensor, for example, a camera. . . . I believe that anything that is indistinguishable from an image that some camera could have acquired is enough to be an acquired image."[48]  Dr. Forsyth was also asked "[h]ow do you draw the line between processing of an image in which the resulting image is still considered acquired imagery and processing in which the resulting image is not considered acquired imagery?"[49]  Dr. Forsyth responded that "[i]f one wants to draw the line, the fair and sensible place seems to be that an image is an acquired image if at the time – if it was equivalent to an image that could have come out of some camera available at the time and equivalent in the sense that a POSITA would have agreed that it was equivalent."[50]

There is no doubt that Dr. Forsyth's interpretation goes further than the Court's construction of "tweening"—the parties did not ask the Court to construct "acquired imagery." However, Dr. Forsyth's current argument appears to be a reincarnation of Microsoft's proposed

---

[46] Claim Constr. Op. at 21–22.
[47] *Id.* at 25.
[48] Dkt. No. 232-5, Deposition of David A. Forsyth ("Forsyth Deposition") at 53:25–54:15.
[49] *Id.* at 56:19–24.
[50] *Id.* at 57:22–58:5.

camera requirement.  Dr. Forsyth testified that "I believe it to be fair to say that if you could have used a camera to [process the image], then the fact that you did it in a computer was not significant" to whether that renders an image no longer "acquired"[51] and thus, the issue is not whether any processing occurred, as Kewazinga frames it, but whether the processing that results in an image that could not have come out of some camera available at the time and equivalent to the acquiring cameras, affects whether an image is acquired.  The Court's construction of tweening does not impose a one-level limitation on the generation of synthetic imagery, nor does it take a post-processing-based approach to whether an image remains acquired or not.  Under the Court's construction, tweening would not be affected so long as the starting bubbles used in the process were ultimately derived from undisputedly acquired images.  Instead, Dr. Forsyth is defining "acquired imagery" based on the outcome of the processing, which has no basis in the Court's construction of the term.

Accordingly, Dr. Forsyth's opinions as to this issue are excluded.

### 2.      Dr. Forsyth's Opinions on Mosaicing

Next, Kewazinga requests that that the Court exclude the entirety of Dr. Forsyth's non-infringement opinions regarding the "mosaicing" limitations in the asserted claims, arguing that the opinions are premised on contradictions of the Court's construction of the term.  The Court has construed "mosaicing" to mean "creating imagery assembled from a plurality of images, or portions thereof, including an alignment process and a composition process."[52]  Kewazinga argues that Dr. Forsyth has interpreted mosaicing to include overlapping images, looks to an outcome-based requirement for the alignment process, requires processing aimed at reducing seams, and is untimely

---

[51] *Id.* at 60:19–61:7.
[52] Claim Constr. Op. at 20.

in raising opinions on processing aimed at reducing seams, which rely on an outcome-based requirement.

<strong>a)        Overlapping Details Requirement</strong>

First, Kewazinga argues that Dr. Forsyth's opinions impermissibly read an overlapping images requirement into the term "mosaicing."  Kewazinga points to Dr. Forsyth's opinions in his rebuttal report, in which he states that while "there are various techniques for performing mosaicing's alignment," the Burt patent instructs that "[a] mosaicing alignment process must cause details in overlapping images to lie on top of one another."[53]  According to Kewazinga, this conclusion contradicts the Court's reading of the Burt Patent in its construction of the term "mosaicing."[54]  During claim construction, the Court rejected Microsoft's argument that "mosaicing" required that the "images to be 'mosaiced' must be overlapping."[55]  As explained by the Court then, any overlapping requirement was derived from surrounding claim language, not the term "mosaicing" itself.[56]  For example, "the Burt Patent teaches that methods for filling gaps between images to be mosaiced is within the scope of the 'mosaicing' process, which would not be necessary if the images in the mosaic were necessarily overlapping."[57]

Microsoft's response to Kewazinga's challenge is that Dr. Forsyth merely opines that *when* the images to be mosaiced contain overlapping details, they must lie on top of one another to minimize redundancy.  The Court agrees.  The Court does not read Dr. Forsyth's opinions to mean that for "mosaicing" to occur, the underlying images must be overlapping ones.  Instead, in the opinions at issue, Dr. Forsyth describes a process that occurs when the acquired images happen to

---

[53] Forsyth Rebuttal Report ¶ 306; *see also id.* ¶ 307 ("A POSITA reading Burt would realize that requiring that any overlapping parts of the two images lie on top of one another is an essential property of an alignment process in mosaicing.").
[54] Kewazinga's Opp. at 27–28.
[55] Claim Construction Op. at 13.
[56] *Id.* at 17.
[57] *Id.* at 18.

be overlapping.  For example, in Dr. Forsyth's report, he says that "[a] POSITA reading Burt would realize that requiring that *any overlapping parts* of the two images lie on top of one another is an essential property of an alignment process in mosaicing."[58]  Thus, Dr. Forsyth's use of "any" instead of "the" indicates that the alignment process could apply to images that contain no overlapping parts.  Dr. Forsyth further explains that "[a]ll of the alignment descriptions for mosaicing in Burt 032 indicate that alignment involves warping images to each other so that details *that are common* in the two images lie on top of each other.  A POSITA reading Burt would therefore understand that an alignment process for mosaicing must place common details in the overlapping parts of the two images on top of one another with high accuracy."[59]  Again, a plain reading of Dr. Forsyth's opinion does not require that the images include common details, but that any details that are common overlap.  Because this position not eliminate other methods of "mosaicing," such as gap filling, Dr. Forsyth's opinion does necessarily not contradict the Court's construction of the "mosaicing" and Kewazinga's motion is denied as to this first argument.  However, as the Court will explain below, there is a separate problem with Dr. Forsyth's conclusion that mosaicing requires that common details always overlap.

b)      **Outcome-Based Requirement**

Kewazinga further argues that Dr. Forsyth's opinions should be excluded because they read an outcome-based requirement into the alignment process.[60]  As stated above, the Court does not read Dr. Forsyth's opinions as requiring the images used in the mosaicing process to lay on top of one another.  However, Dr. Forsyth's opinion that mosaicing requires that duplicative details must always overlap imposes a seamless requirement that has already been rejected by the Court.  In reaching that opinion, Dr. Forsyth assumes that the minimizing of temporal and spatial information

---

[58] Forsyth Rebuttal Report ¶ 307.
[59] *Id.* ¶ 315.
[60] Kewazinga's Mot. at 9.

redundancy that occurs in the mosaicing process requires that details in overlapping images lie on top of one another.[61]

The Court was clear in its construction of "mosaicing" that the term does not necessarily contain an outcome-based requirement, such that a seamless image always results.  By claiming that the alignment process *must* ensure that common details overlap and that multiples are eliminated, Dr. Forsyth returns to Microsoft's overly broad interpretation of the term.  Dr. Forsyth takes an outcome-based approach in explaining the process undertaken by the Maps App and highlights that "[t]he result[ing image] is . . . a view that is not continuous, not uniform, and obviously a disjointed combination of the two bubble images from different locations and does not look like it was captured by a camera in between the beginning and ending bubble image."[62]  He then explains that "[i]t is apparent *from viewing the cross-fade* that no attempt is made to show a seamless view to the user, and the result is certainly not a seamless view.  Indeed, the goal is not to create a seamless view so that the user is provided a cue that the view is changing to a new location, and the code contains nothing that has the aim of creating a seamless view."  Thus, even though Dr. Forsyth announces that he concludes "that the 'mosaicing' process as disclosed in the Asserted Patents and the Burt 032 patent must include processes at least aimed at creating a seamless mosaic image or view, even if the end result may not be perfect seamlessness," it is clear from his analysis that he arrived at his conclusions about whether the code aims at creating a seamless view by looking to the final result. Dr. Forsyth opines that the code contains "nothing that has the aim of creating a seamless view" but he doesn't provide analysis of the code to support that conclusion;  he instead uses that conclusory opinion to bolster his point that the misaligned imagery of the same location must mean that no

---

[61]  Forsyth Rebuttal Report ¶ 309; *see also id.* ¶ 311 ("[T]he alignment process *ensures* that any overlapping details in the images lie on top of one another.  Otherwise, there would be multiple versions of each house and each tree close to one another." (emphasis added)).
[62]  *Id.* ¶ 355.

attempt was made to show seamless views.  This logic contradicts the Court's explanation of why a process-focused, not outcome-based construction of "mosaicing" was proper.  Accordingly, Kewazinga's motion is granted as to these issues and Dr. Forsyth's opinions that rely on such outcome-based approaches are excluded.[63]

### c)      Mosaicing Process Aimed at Creating Seamlessness

Kewazinga additionally challenges Dr. Forsyth's opinion that "[i]n addition to not performing a mosaicing alignment process, none of the Streetside clients performed the required mosaicing because they included no effort to create a seamless mosaic."  Kewazinga interprets this as an untimely attempt to opine on the meaning of the term "composition process" as incorporated in the Court's construction of "mosaicing."  In the Court's claim construction opinion, it noted that

> the "mosaicing" process taught by the Burt Patent includes image processing aimed at reducing seams in the resulting image.  The Court further understands that in the methods and systems taught by the Burt Patent, such processing takes place during the "composition" process.  For the reasons above, the Court has rejected the proposed requirement that "mosaicing" must result in a seamless image.  In the event that the presence or absence of image processing aimed at reducing seams in "mosaiced" images proves to be pertinent to any claim or defense in this case, the Court will consider supplemental briefing as to the meaning of the term "composition process."[64]

The timing of this issue is instructive here:  there was no clear reason that the parties should have known that they would need to brief the term "composition process" until after the expert reports were produced.  This issue was contemplated by the Court and is directly addressed by the

---

[63] *See id.* ¶ 355 ("A seamless view would neither show multiple light poles, nor show the light poles projected in different directions.  The result is instead a view that is not continuous, not uniform, and obviously a disjointed combination of the two bubble images from different locations and does not look like it was captured by a camera in between the beginning and ending bubble image. *It is apparent from viewing the cross-fade* that no attempt is made to show a seamless view to the user, and the result is certainly not a seamless view.") (internal citation omitted); *Id.* ¶ 356 ("During a transition between imagery at different locations, the Bing Maps HTML5 client only performs a cross-fade, similar to the Maps App.  For the same reasons as discussed above, it is apparent from viewing the cross-fade that no attempt is made to show seamless views to the user. Instead, as with the Maps App, the result is a view that is not continuous, not uniform, and obviously a disjointed combination of the two bubble images from different locations and does not look like it was captured by a camera in between the beginning and ending bubble image." (internal citations omitted).
[64] Claim Constr. Op. at 17 n.8.

15

Court's guidance in its claim construction opinion.  The Court accepts Microsoft's proffer that they did not waive their right to brief the question raised in the Court's claim construction opinion because "it would have been a waste of party and judicial resources for Microsoft to raise the issue before Kewazinga finally explained its theory of infringement in its recent expert reports."[65] Therefore, because the issue is timely, the Court will permit the parties to present their interpretations of the composition process that occurs during mosaicing, as the Court previously informed the parties it would.  Accordingly, Kewazinga's motion as to this issue is denied.  The Court will set a briefing schedule by separate order.

### 3.    Dr. Forsyth's Opinions on Seamless View

Kewazinga also seeks to exclude Dr. Forsyth's opinions that rely on different interpretations of the term "seamless view."  "Claim terms must be construed the same way for the purpose of determining invalidity and infringement."[66]  "A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."[67]

As explained above, in connection with his non-infringement opinion, Dr. Forsyth opined that the accused Maps App, Bing Maps Website, and Silverlight client do not provide a "seamless view," because, during bubble-to-bubble transitions, "redundancies" are displayed, "resulting in a view that is not continuous, not uniform, and obviously a combination of multiple images and do not look like they were captured by a camera in between the beginning and ending bubble image."[68] In connection with his invalidity analysis, Dr. Forsyth testified that there may be "[a]rtifacts or

---

[65] Microsoft Opp. at 11–12.
[66] *TVIIM, LLC v. McAfee, Inc.*, 851 F.3d 1356, 1362 (Fed. Cir. 2017)
[67] *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).
[68] Forsyth Rebuttal Report ¶¶ 384–86 ("transitions by the Silverlight client also display gaps in the environment" and are not seamless).

inaccuracies that would still allow the navigation between the views to be seamless."[69]  Kewazinga argues that these views are inconsistent and Dr. Forsyth's opinions should be excluded.

The Court has reviewed Dr. Forsyth's opinions and does not understand there to be a discrepancy as Kewazinga describes.  Dr. Forsyth's opinions appear to be tied back to the goals of the mosaicing process.  Dr. Forsyth opined that the accused instrumentalities *intentionally* display redundancies, resulting in a view that is not seamless.  This is not inconsistent with Dr. Forsyth's opinion that gaps or inaccuracies caused by small *unavoidable errors* do not necessarily mean that a view is not seamless.  In any event, any discrepancies between an expert's opinions go to the weight of the evidence, not admissibility, and can be properly challenged during cross-examination.[70]  Accordingly, the Court is not persuaded by Kewazinga's argument and the motion is denied as to this issue.

### 4.    Dr. Forsyth's Opinions on Array of Cameras

Kewazinga seeks to preclude Dr. Forsyth from testifying that "an array of cameras" excludes a collection of cameras sequentially positioned through an environment.[71]  The Court construes the term "array of cameras" as "a set of multiple cameras, each fixed in relation to each other."[72]  Kewazinga argues that in the '325 patent, Figure 11 illustrates an embodiment with a collection of cylinders labeled as "10":

---

[69] Dkt. No. 232-5, Forsyth Deposition. at 223:13–15; *see also id.* at 222, 225-226, 228, 229, 230 (providing examples of situations in which transitions would be considered seamless despite the presence of artifacts or inaccuracies, e.g., "[s]mall artifacts caused by minor errors in correspondence, computation or inference in the view" or "[o]ccasional small gaps caused by unavoidable problems with relief").

[70] *See Phelps v. CBS Corp.*, 2020 WL 7028954, at *8 (S.D.N.Y. Nov. 30, 2020) ("If expert testimony is otherwise admissible, then critiques that there are 'gaps or inconsistencies' in the reasoning underlying the expert's conclusions speak to the weight of the evidence, not its admissibility." (citing *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001))).

[71] Kewazinga Mot. at 16.

[72] Claim Constr. Op. at 32–33.



FIG.11

According to Dr. Hanna, label 10 supports Kewazinga's theory of infringement because it discloses an embodiment in which cameras are sequentially positioned through an environment. Kewazinga's request arises from Dr. Forsyth's testimony that he has "no opinion about what the POSITA would assume the label 10 [in Figure 11] referred to."[73]

Kewazinga first argues that Dr. Forsyth should not be permitted to testify as to the meaning of label 10 in Figure 11 because he has not disclosed any opinions on that illustration, and affirmatively stated that he had none. That request is reasonable. Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure governs expert disclosures. Under that rule, a party must provide from its expert "a complete statement of all opinions the witness will express and the basis and reasons for them."[74] "'The expert's report operates to limit the scope of the testimony that can be elicited from the expert. Opinions that are not disclosed in the expert's report cannot be offered.'"[75] "It is assumed that at the time an expert issues his report, that report reflects his full knowledge and

---

[73] Dkt. No. 210-4, Forsyth Deposition at 149:7–20 ("Q. . . . So your opinion regarding the array of cameras in Figure 11 would assume that a person of ordinary skill in the art would view label 10 and label 12-N in Figure 11 to refer to the same thing, right?  A.  No.  I had no opinion about what the POSITA would assume the label 10 referred to . . . .").
[74] Fed. R. Civ. P. 26(a)(2)(B)(i).
[75] *Camarata v. Experian Info. Sols., Inc.*, 2018 WL 1738335, at *1 (S.D.N.Y. Mar. 5, 2018) (quoting *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *9 (S.D.N.Y. Feb. 14, 2012)).

complete opinions on the issues for which his opinion has been sought."[76]  The Court notes that it does not expect Microsoft to contest this decision, given its framing of label 10 as mysterious and irrelevant.

Kewazinga then argues that Dr. Forsyth's opinions about the "array of cameras" limitation are therefore unreliable, because the meaning of label 10 in Figure 11 "bear[s] directly" on—and in some cases contradict—Dr. Forsyth's conclusions about what an array of cameras can be comprised of.  This argument goes a step too far.  Dr. Forsyth did not say he did not consider label 10 or the image that label 10 points to in Figure 11.  He merely said that he did not form any opinions as to what a POSITA would understand label 10 to refer to.  That fact alone does not justify the exclusion of *all* of Dr. Forsyth's opinions regarding the "array of cameras."  For example, Kewazinga argues that the meaning of label 10 bears directly on Dr. Forsyth's opinion that "[t]he Asserted Patents describe an array as a physical object consisting of multiple distinct cameras attached to some rigid framework."  *Kewazinga's* interpretation of the meaning of label 10 may have some influence as to how the jury may view that opinion of Dr. Forsyth, but Dr. Forsyth's lack of an opinion on label 10 alone does not render that statement inadmissible.

And finally, Kewazinga further argues that because Dr. Forsyth did not disclose any opinions about label 10, he should not be permitted to rebut Dr. Hanna's opinion on the image, which is that label 10 is an array being formed by sequentially positioning over time a camera or cameras through an environment.  This too is a step too far.  Dr. Forsyth can testify as any fallacies in Dr. Hanna's reasoning without providing his own opinions regarding what label 10 depicts.

Accordingly, Kewazinga's motion on this issue is granted in part and denied in part.

---

[76] *Peterson v. Home Depot U.S.A., Inc.*, 2013 WL 5502816, at *3 (S.D.N.Y. Oct. 3, 2013) (internal quotation marks and citation omitted), *reconsideration denied*, 2014 WL 135562 (S.D.N.Y. Apr. 4, 2014); *see Gyllenhammer v. Am. Nat'l Red Cross*, 2018 WL 1956426, at *4 (N.D.N.Y. Jan. 23, 2018).

>         5.      **Dr. Forsyth's Opinions Based on the Written Description Requirement**
>
>         a)      **Application of Written Description Requirement Standard**

Kewazinga next challenges Dr. Forsyth's invalidity opinions based on the written description requirement, arguing that Dr. Forsyth applied the wrong standard in reaching his opinions. Satisfaction of the written description requirement the patent application conveys to a POSITA that the applicants were in possession of the claimed invention.[77]  "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art."[78]  Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed."[79]  Despite correctly identifying the proper standard in his report, Dr. Forsyth testified that a different inquiry guided his analysis.  However, that contradiction goes to the weight, not the admissibility of the evidence, and Dr. Forsyth's opinions may be challenged on cross-examination.

In its motion, Kewazinga highlights that Dr. Forsyth testified that his belief that "there was evidence that *the patent applicant* did not understand and possess the claimed subject matter" had an effect on his written description opinion, and that he believed the applicants' understanding to be relevant to the written description inquiry.[80]  In the portion of Dr. Forsyth's deposition cited by Kewazinga, Dr. Forsyth states that his belief about evidence of what the patent applicant understood and possessed was a driving force in his analysis, and that it "led [him] to believe that there was not a full written description."[81]  Dr. Forsyth did not specify what evidence he was referring to while making that statement, but Federal Circuit precedent is clear that the test for written description sufficiency is limited to the "four corners of the specification."

---

[77] *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351–52 (Fed. Cir. 2010).
[78] *Id.* at 1351.
[79] *Id.*
[80] Dkt. No. 210-4, Forsyth Deposition. at 193:2–194:14.
[81] *Id.*

However, this deposition snippet is contradicted by Dr. Forsyth's testimony that he understood and applied the POSITA-focused standard in reaching his written description opinions, even quoting the Federal Circuit Bar Association's Model Jury Instruction.[82]  And, just before the portion of Dr. Forsyth's deposition testimony at issue, he faults Dr. Hanna for "not focus[ing] on whether a POSITA would conclude from the patent application that the patent applicants understood and possessed this claimed subject matter."[83]

Under FRE 702, the Court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."[84]  "The district court has broad discretion to carry out this gatekeeping function."[85]  The Supreme Court has explained that cross-examination of an expert is important "in testing [the expert's] honesty, proficiency, and methodology."[86]  Cross-examination of an expert witness can illustrate the witness's "lack of proper training or deficiency in judgment" and cross-examination may explore the expert's "methodology," which "requires the exercise of judgment and presents a risk of error."[87]  Here, Dr. Forsyth testified that his opinion was informed by his belief about evidence that the patent applicant did not understand and possess the claimed subject matter, which was an improper evaluation of the written description requirement. However, this statement was contradicted by Dr. Forsyth's expert report and testimony at other

---

[82] Ex. 6 to Microsoft's Opp.  ("Forsyth Opening Report") ¶ 32 ("Principles of Written Description . . . In deciding whether the patent satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of technology of the patent when the application was filed.  The written description requirement is satisfied if a person having ordinary skill reading the original patent application would have recognized that it describes the full scope of the claimed invention as it is finally claimed in the issued patent and that the inventor actually possessed that full scope by the filing date of the original application."); Dkt. No. 243-5, Forsyth Deposition , at 269:11–270:3 ("I applied that standard [from the Federal Circuit Bar Association's Model Jury Instruction] in opining in my written reports and I did my best to reproduce that standard when [counsel for Kewazinga] asked me about it.").

[83] Dkt. No. 210-4,Forsyth Depositionat 193:2–19.

[84] *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert*, 509 U.S. at 597) (internal quotation marks omitted).

[85] *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016).

[86] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321 (2009).

[87] *Id.* at 320; *see also Howard v. Walker*, 406 F.3d 114, 127 (2d Cir. 2005) ("On cross-examination, an attorney is free to challenge an expert's methodology, her conclusions, and the bases for her conclusions.  To the extent that the reliability of certain facts accepted by an expert is questionable, the exercise and process of cross-examination allow a defendant to bring any such factual disputes to the attention of the jury").

times in his deposition, which both indicate that he understood and applied the proper standard, which looks to the description from the view of a POSITA.  Rather than excluding Dr. Forsyth's written description opinions, Kewazinga may challenge Dr. Forsyth's conclusions and the basis for those conclusions on cross-examination.

### b)      Scope of "Local Scene Characteristics"

Kewazinga separately challenges Dr. Forsyth's opinions on the written description requirement for "tweening."  Kewazinga argues that Dr. Forsyth's opinions are unreliable because they are based on Dr. Forsyth's assumption that an acquired image is itself a "local scene characteristic" and the Court previously rejected a construction of tweening that included a "local scene characteristics" restriction.  During claim construction, the Court construed "tweening" as requiring the use of "acquired imagery" but not "local scene characteristics."[88]  The Court expressly rejected Microsoft's proposal that "tweening" require the use of "local scene characteristics," and explained that the proposal was contradicted by the intrinsic evidence because the claims asserted in the '234 patent specifically described a "tweening" process using "local scene characteristics," so imposing such a requirement would render the language of that claim duplicative.[89]  The Court construed the term "local scene characteristics" to mean "information about the environment."[90]  In doing so, the Court noted that the two potential constructions of the term "local scene characteristics"—"attributes of a local region" and "information about the environment"—were nearly synonymous, but opted to use the term "information about the environment" to avoid a circular and confusing construction that would result from "attributes of a local region."[91]

---

[88] Claim Construction Op. at 26.
[89] *Id.* at 24–26.
[90]. *Id.* at 39.
[91] *Id.*

Dr. Forsyth opined in his opening report that because "the full scope of 'tweening' includes 'tweening' without the use of 'information about the environment' derived from imagery or any other sensor data. . . ."tweening" operations without 'information about the environment' are not described by the October 1999 Application, nor the incorporated references."[92]  Dr. Forsyth arrived at that conclusion by determining that the October 1999 Application only describes "tweening" using local scene characteristics, which he describes as "radiance at points that generated pixels," which is information about the environment because "[a]cquired imagery *is* 'information about the environment.'"[93]  Therefore, according to Dr. Forsyth, the techniques described in the October 1999 Application cannot tween without using "information about the environment" and therefore, "to the extent that the claims purport to cover tweening without using 'local scene characteristics', it is [his] opinion that the October 1999 Application fails to describe tweening in a manner to convey to a POSITA that the Kewazinga Applicants were in possession of the full scope of the subject matter of the tweening claims."[94]

As previously explained by the Court, "neither the intrinsic nor the extrinsic evidence support[ed] Defendant's proposed restriction that 'local scene characteristics' must be derived from imagery."[95]  With the Court's construction of "tweening" and "local scene characteristics" in mind, Microsoft's attempt to explain away the flaws in Dr. Forsyth's opinions fall flat.  As Dr. Forsyth asserts, based on his pronouncement that "acquired imagery is "information about the environment[,]" and the assumption that information about the environment necessarily means "local scene characteristics"[96] it would have been impossible for the October 1999 Application to

---

[92] Forsyth Opening Report ¶ 337-38, Dkt. No. 210-1 (Ex. 1 to Microsoft's Mot.) (emphasis added).
[93] *Id.* ¶ 338.
[94] *Id.* ¶ 334–38 (internal citation omitted) (emphasis added).
[95] Claim Constr. Op. at 38.
[96] To be clear, the Court construed "local scene characteristics" to mean "information about the environment," not the reverse.

have disclosed the full scope of "tweening" covered by the patents[97] because, as the Court has already explained, tweening requires the presence of acquired imagery. This circular logic is another attempt to re-litigate and narrow the Court's construction of "tweening" and impose Microsoft's previous "local scene characteristics" requirement.[98] The Court explained in its claim construction opinion that the Hanna Patent, which was incorporated into the '234 Patent as an exemplar of tweening, disclosed local scene characteristics that were not "derived from imagery," such as "scene structure and shape of a local region, such as the orientation and depth/range of a planar surface in the local region."[99] The Court's conclusion that "local scene characteristics" are not limited to imagery is instructive here. Drawing a false equivalency between acquired imagery and local scene characteristics because Dr. Forsyth has concluded that both are "information about the environment" is nonsensical in the context of the Court's construction of the terms.

Accordingly, the Court agrees with Kewazinga's challenge to the reliability of Dr. Forsyth's written description opinion of "tweening" and Kewazinga's motion as to this issue is granted.

## B. Request to Exclude Testimony and Opinions from Dr. Meyer

Next, Kewazinga seeks to exclude the opinions of Dr. Meyer, Microsoft's damages expert, on the basis that Dr. Meyer "ignored and formed no opinion regarding" the existence of the Bing ecosystem, including the impact of the removal of Streetside on Bing advertising revenue or the Bing and Bing Maps user bases, and that she failed to address Microsoft's internal documents which "confirm that Streetside is critical to the Bing ecosystem."[100] Kewazinga asserts that Dr. Meyer's failure to consider this failure to consider the Bing ecosystem in her opinions on the appropriate

---

[97] Forsyth Opening Report ¶ 337.
[98] Notably, in proposing that requirement during claim construction, Microsoft did not argue that acquired imagery meant local scene characteristics.
[99] Claim Constr. Op. at 38 (citing Hanna Decl. ¶¶ 56–57; Hanna Supp. Decl. ¶¶ 41–42) (internal quotation marks omitted).
[100] Kewazinga's Mot. at 25, 30.

royalty base to assess damages renders her opinion unreliable and inadmissible.[101]  For those reasons, Kewazinga seeks to preclude Dr. Meyer from "(1) testifying that the royalty base should not include Bing.com users and revenue derived therefrom; (2) [testifying] as to whether, if Microsoft were to cease offering Bing Maps, there would be an impact on advertising revenue generated by Bing.com; and (3) offering an opinion as to the impact on the number of users of Bing Maps due to removal of Streetside."[102]

Kewazinga "bears the burden of proving damages."[103]  Dr. Meyer is Microsoft's rebuttal expert, and her role is different from that of Kewazinga's affirmative expert, Ms. Riley.  "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another.  There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party."[104]  "[D]efendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts."[105]

Kewazinga criticizes Dr. Meyer for "failing to acknowledge" the Bing ecosystem and consider key documents that demonstrate the importance of Streetside to the Bing ecosystem. Microsoft responds that Dr. Meyer did consider the Bing ecosystem and that any criticism that she did not form opinions on specific pieces of evidence should go to the weight of her testimony, not the admissibility.  The Court agrees with Microsoft's argument.  There is no evidence that Dr. Meyer did not consider the existence of Bing's "ecosystem" in forming her opinions.  In fact, in her report, Dr. Meyer acknowledges the interrelated nature of the Bing products, though she does not use the

---

[101] *Id.* at 26.
[102] *Id.* at 30.
[103] *Uniloc USA v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).
[104] *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015).
[105] *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007).

specific term "ecosystem."[106]  In any event, Dr. Meyer's failure to consider specific internal documents would not render her entire position on an ecosystem damages theory wholly inadmissible.[107]  In Dr. Meyer's reports, she considers Dr. Riley's ecosystem approach, then explains why she thinks that a different approach should be taken.  This critique of Ms. Riley's report is perfectly acceptable from a rebuttal expert such as Dr. Meyer.  And, Dr. Meyer's opinions that disagree with Mr. Riley's opinions, as well as Dr. Meyer's credibility, can challenged through cross-examination. Accordingly, Kewazinga's motion to preclude Dr. Meyer's opinions is denied on this ground.

## IV.     Microsoft's Motion to Exclude

### A.     Request to Exclude Portions of Dr. Hanna's Opinions

Microsoft has requested that the Court exclude Dr. Hanna's opinions (1) on consumer preferences, and Microsoft's preferences, knowledge, and intent, (2) to the extent they are not based on sufficient facts or reliable principles and methods, and (3) on Kewazinga's proposed amended contentions on "array of cameras."  The Court will discuss each of these requests in turn.

#### 1.     Dr. Hanna's Opinions on Consumer Preferences and Microsoft's Preferences, Knowledge, and Intent.

Microsoft seeks to exclude Dr. Hanna's opinions on certain topics because they are assumed to be outside his expertise.  Specifically, Microsoft points to Dr. Hanna's opinions on (1) consumer preferences and benefits; (2) whether certain uses of Streetside qualify as "substantial"; (2) whether

---

[106] *See* Ex. 10 to Microsoft's Opp. ¶ 32 ("Within search engines (including Bing), there are 'verticals' which allow for more specialized searches.  One such 'vertical' is web mapping service, such as Bing.com/Maps."); *Id.* ¶ 112("Potential other features of Bing.com/Maps not tracked in the usage data [relied upon by Ms. Riley] include 3D Maps, Traffic, Offline Maps, and My Places.").

[107] *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996); *Amorgianos*, 303 F.3d at 267 (explaining that cross-examination is the appropriate tool to challenge "reliable, albeit debatable, expert testimony."); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016) (expert's failure to consider some allegedly relevant documents was best addressed by cross-examination).

consumers experienced a long-felt but unmet need; and (4) Microsoft's state of mind and decision-making.

a)      **Testimony on User Experience**

First, Microsoft seeks to exclude Dr. Hanna's opinions regarding the effect of mosaicing and tweening on the user experience.  In his opening and rebuttal reports, Dr. Hanna opines on whether the limitations are "beneficial" to or provide a "better" user experience, also noting that "it is important for multiple users to be able to simultaneously and independently navigate the imagery." Microsoft highlights that Dr. Hanna did not specifically list the field of consumer behavior and preferences as one of his areas of expertise, and that Microsoft also argues that Dr. Hanna has not identified any scientific methodology for his opinions on consumer preferences.[108]

Microsoft mischaracterizes Dr. Hanna's opinions.  He does not opine on what consumers value in a product.  His opinions describe the benefits that mosaicing and tweening can provide to an application in terms of transitions where the navigation is smoothed, as compared to transitions that are not.  Dr. Hanna is qualified to render opinions on the value add of mosaicing and tweening because he has extensive experience developing that technology, and in transitioning initiatives to deployment or commercialization.[109]  Dr. Hanna is permitted to testify about conclusions drawn "from a set of observations based on extensive and specialized experience[.]"[110]  Furthermore, Microsoft's challenges to Dr. Hanna's qualifications would go to the weight of his testimony, not its admissibility.[111]

---

[108] Microsoft's Mot. at 3–4.
[109] Ex. 1. to Kewazinga's Opp. ("Hanna Opening Report") ¶ 7–10.
[110] *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony.").
[111] *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (objections to an expert's qualifications generally go to the "weight and credibility" of the expert's testimony, not its admissibility); *accord CSL Silicones, Inc. v. Midsun Group Inc.*, 2017 WL 6055380, at *5 (D. Conn. Dec. 7, 2017) (disputes regarding an expert's qualifications "do not often warrant blanket exclusion of the testimony").

The cases that Microsoft cites are distinguishable here.  Those cases discussed testimony regarding the expert witness's personal preference or perception about the quality of the products at issue.[112]  Significantly, the claims at issue in those cases were trademark claims, and the testimony was presented in connection with arguments about the *Polaroid* factors, which require an analysis of the likelihood of consumer confusion in trade dress cases.  In that context, consumer surveys are routinely presented.[113]

 For these reasons, Microsoft's motion as denied as to this issue.

### b)      Testimony on Consumer Use

Second, Microsoft argues that Dr. Hanna should not be permitted to testify on whether consumer use of Streetside is "substantial" because he did not provide any supporting data for his opinions, and that even if user surveys were provided, Dr. Hanna does not have specialized knowledge on extracting opinions from such surveys.[114]  To prevail on its contributory infringement claim, Kewazinga must prove that the accused product is not "suitable for substantial noninfringing use."[115]  Microsoft specifically asserts that "Hanna seeks to tell the Jury that millions of consumers do not use Streetside without navigating from one bubble to another" but they have not specified what the basis is for that statement.  Indeed, in the opinions that Microsoft challenges, Dr. Hanna did not opine on the number of consumers who used Streetside to navigate.[116]

Thus, it appears that Microsoft's argument is based on a mischaracterization of Dr. Hanna's opinion.  Dr. Hanna opined that "that navigation in Streetside is a critical aspect of Streetside and, thus, it is my opinion that that the Streetside navigation feature together with the other components

---

[112] *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 675 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 24 (2d Cir. 2017); *Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 377 (S.D.N.Y. 2003).
[113] *See Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, 1999 WL 191527, at *12 (S.D.N.Y. Apr. 7, 1999) ("[A] plaintiff's failure to offer a survey showing the existence of confusion is evidence that the likelihood of confusion cannot be shown.").
[114] Microsoft's Mot. at 4–5.
[115] 35 U.S.C. § 271(c).
[116] *See* Kewazinga's Opp. at 4 n.4 (internal quotation marks omitted).

—

of Streetside provided by Microsoft are a material part of the claimed invention with no substantial, non-infringing use and that they are not a staple article of commerce suitable for non-infringing uses."[117]  This statement goes to Kewazinga's burden to prove whether the accused product has substantial non-infringing uses, and not, as Microsoft asserts, how and how often consumers actually use the product.[118]  Accordingly, Microsoft's motion with respect to this issue is denied.

### c)  Opinions Regarding Industry Need

Third, Microsoft seeks to exclude Dr. Hanna's opinions in ¶¶ 567-570 of his rebuttal report regarding a "long-felt, but unmet, need for a telepresence system that had the claimed features of the Asserted Claims" because Dr. Hanna has not provided any supporting evidence or supporting references other than the '234 patent, nor identified any attempts by others to resolve this purported long-felt need.[119]  Dr. Hanna is qualified to give such testimony based on his experience in R&D and preparing products for commercialization and deployment.

Microsoft has not shown that Dr. Hanna's reliance on the '234 patent is insufficient.  The '234 patent describes prior art and lists attempts by others to resolve the need.[120]  In doing so, the patent also explains why the prior art was insufficient for addressing all of the claims in the patent.  Thus, Microsoft's assertion is plainly wrong.  Microsoft's motion in this issue is denied and Microsoft can challenge Dr. Hanna's opinions on cross-examination or through rebuttal testimony.

---

[117] Ex. 6 to Microsoft's Mot. ("Hanna Reply Report") ¶ 365.

[118] In its brief, Microsoft cites *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 F. App'x 489, 493 (Fed. Cir. 2019), which is not analogous here.  In that case, the Federal Circuit, applying Third Circuit law, affirmed the exclusion of a customer-use survey and expert testimony relying on the survey.  The survey was offered as evidence of direct infringement, but the district court found that due to the survey design—which included broad language and lacked questions on a relevant issue—the results would not assist the trier of fact on that issue.  *Id.*  The *Parallel Networks* court did not reach the conclusion that Microsoft is asking the Court to make here—that expert testimony should be excluded when user surveys are not provided to support an expert's opinion.

[119] Microsoft's Mot. at 5 (internal quotation marks omitted).

[120] *See* Dkt. No. 1-1 at 2:8–42 ("Apparently, attempts have been made to develop telepresence systems to satisfy some of the foregoing needs. . . . This system, however, has several drawbacks. . . . Other attempts at providing a telepresence system have taken the form of 360-degree camera systems. . . .  Such 360-degree camera systems also suffer from drawbacks.").

### d)   Testimony on Microsoft's State of Mind

Fourth, Microsoft seeks to preclude Dr. Hanna from testifying on Microsoft's state of mind.[121]   To prove induced infringement, the patentee must show direct infringement, and that the alleged infringer "knowingly induced infringement and possessed specific intent to encourage another's infringement."[122]   Expert opinions about beliefs, intents, or motives are inadmissible.[123] "Because science has not yet invented a way to read minds, 'inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.'"[124]   "Instead, juries must answer questions of intent with the lay tools that they always have: examination of testimony and documents, and assessment of credibility."[125]   Moreover, "[t]he drawing of inferences, particularly in respect of an intent-implicating question . . . is peculiarly within the province of the fact finder that observed the witnesses."[126]   This body of case law supports the exclusion of Dr. Hanna's opinions on Microsoft's intent to induce infringement.

Kewazinga argues that Dr. Hanna is permitted to provide expert testimony on the intended operation of the accused products and whether Microsoft encouraged and intended users to infringe.[127]   In raising this argument, Kewazinga heavily relies on *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1322 (Fed. Cir. 2009) and *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 735 F. Supp. 2d

---

[121] Microsoft's Mot. at 5–6.

[122] *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005); *see* 35 U.S.C. § 271(b).

[123] *See, e.g.*, *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (excluding expert testimony "as to the state of mind and knowledge possessed by defendants and non-parties"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (precluding expert testimony concerning "intent, motives or states of mind"); *Bd. of Trs. of AFTRA Retir. Fund v. JPMorgan Chase Bank, N.A.*, 2011 WL 6288415, at *8 (S.D.N.Y. Dec. 15, 2011) ("There is no dispute that opinions concerning state of mind are an inappropriate topic for expert opinion.").

[124] *AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at *13 (S.D.N.Y. Mar. 19, 2019) (quoting *Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 546) (internal quotation marks omitted).

[125] *AU New Haven*, 2019 WL 1254763, at *13.

[126] *Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986); *see also Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (declining to disturb jury's verdict because intent to induce infringement "is a factual determination particularly within the province of the trier of fact" (quoting *Allen Organ Co. v. Kimball Int'l, Inc.*, 839 F.2d 1556, 1557 (Fed. Cir. 1988))).

[127] Kewazinga's Opp. at 5.

560, 573 (E.D. Tex. 2010).  In *Lucent*, the expert witness testified that Microsoft, also the defendant in that case, "intended users to use . . . forms and different tools" and that Microsoft knew they designed their product to use the forms and tools.  The witness then provided expert testimony that the use formed material part of the limitations of a claim of the patent-in-suit.  The expert also examined a Microsoft document and opined that the language of the document encouraged the method of the claim.  In *ClearValue*, the expert testified that in his opinion, the defendant's training manuals and seminars encouraged people to combining certain products in a manner that was taught by a claim in the patent-in-suit.  The court concluded that there was legally sufficient evidence to conclude that the intent requirement for inducement was satisfied.

Those cases are distinguishable here.  In *Lucent* and *ClearValue*, the witness opined on the defendant's intention in design or structure behind the product, then compared the user experience or training materials to the claims of the patent-in-suit and arriving at the conclusion that if the steps were taken as the defendant designed them to be, infringement would occur.  Here, Dr. Hanna expressly opines on Microsoft's knowledge with regard to infringement.[128]  Furthermore, in *Lucent* and *ClearValue*, the expert opinions went beyond the understanding of the typical juror—it was helpful to have the opinions based on the witness's knowledge and expertise as to whether the product or manuals as they existed encouraged the performance of activities included in the claims.  In this case, Dr. Hanna provides his opinions on what Microsoft thought was important by drawing inferences based on Microsoft's public and internal statements.  A factfinder could engage in the same exercise, and Dr. Hanna's recitation of Microsoft's statements adds little probative value to the inquiry.  To the extent that Kewazinga seeks to discredit Dr. Forsyth's conclusions by pointing to

[128] Hanna Opening Report ¶ 443, Ex. 1 to Microsoft's Mot. ("Further, it is my understanding that Microsoft was aware of the Patents-in-Suit and should have known that the use of Streetside as intended by Microsoft would infringe."); Hanna Reply Report ¶ 364, Ex. 6 to Microsoft' s Mot. (same).

inconsistencies between the evidence and his conclusion as Dr. Hanna did, Kewazinga can do that

on cross-examination.  Accordingly, Microsoft's motion is granted as to this issue.

> **2.     Dr. Hanna's Opinions Not Based on Sufficient Facts or Reliable Principles and Methods.**

Next, Microsoft seeks to exclude Dr. Hanna's opinions on certain topics that are "based on

speculation."  Microsoft first challenges Dr. Hanna's opinion that

> use of Streetside demonstrates that images from different "array[s] of cameras" (*i.e.*, different UCM camera systems mounted on a car, for claim 29 of the '325 patent) are presented to users of Streetside and refutes Dr. Forsyth's contention that there is no evidence that Microsoft has presented users with images captured by different UCM camera systems or mixed images captured by different UCM camera systems.[129]

In that paragraph, Dr. Hanna explained that

> [t]here are multiple places in Streetside where it can be seen that images presented to users have been captured by different UCM camera systems and that those images are mixed (with that mixed imagery being presented to users) during a bubble-to-bubble transition. As one example (using the Bing Maps V8 Streetside client), entering Streetside at 4720 Flintville Road in Delta, Pennsylvania and rotating the resulting bubble towards the nearby T-intersection presents users with the following image. As can be seen in the upper right-hand corner, this image was captured on June 22, 2011. . . . If the user continues to navigate in this direction, the user is presented with the following images. As indicated by the information in the upper right-hand corner, these images were captured on February 17, 2012, over six months after the immediately preceding images in this path. This significant change in capture date, along with the changes in lighting, time of day, and season that are observable from comparing these images to the preceding images indicate that these images were captured using a different UCM camera system over six months later.[130]

Microsoft takes issue with the fact that when discussing the Delta images, Dr. Hanna

focuses his examination on the adjacent images for the same location and points to specific

details that appear different, explaining that the changes were "observable from comparing"

the images.[131]  Microsoft contends that analysis is speculative and must be excluded under

the requirement that expert opinions be the product of reliable principles and methods.

---

[129] Hanna Reply Report ¶ 291, Ex. 6 to Microsoft's Mot.
[130] Hanna Reply Report ¶¶ 291, 293, Dkt. No. 256-2.
[131] Hanna Reply Report ¶ 292, Dkt. No. 218-5.

However, when reading the challenged opinions in connection with Dr. Hanna's opinions on the "swarming approach" and the "overdriving technique," discussed immediately before his comparison of the photos in Delta, Pennsylvania, and in the same section of his opinion, a reasonable inference can be drawn that Dr. Hanna was relying on the swarming theory when comparing the photos and that his opinions were based on an understanding that Microsoft had used the "swarming approach," to gather those particular photos:

> Dr. Forsyth contends that I have not provided evidence that Microsoft "sequentially provides an image from the first array with an image from the second array" and the [sic] is not aware of evidence of that Microsoft has done this. As cited in my March 6, 2020 Opening Infringement Report, Tom Barclay testified on behalf of Microsoft that Microsoft used multiple vehicles to acquire imagery for use in Streetside and, further, that Microsoft employed an approach of "swarming" to send multiple vehicles to acquire imagery in an area. Those vehicles must have had a separate camera system on each vehicle as it is not possible for the same camera system to be on two vehicles at once. This demonstrates that multiple "array[s] of cameras" were used to capture images for use in Streetside and that these images were presented to users. Mr. Barclay testified further about how multiple cars were used to capture images for use in Streetside to ensure proper coverage. Other Microsoft witnesses have corroborated this point, explaining how different cars would "redrive over each other" to acquire images for use in Streetside. Dr. Forsyth himself refers to Microsoft's approach to "overdriving" in acquiring images for use in Streetside though he omits that this involved multiple cars driving over each other as Microsoft employee, Chris Pendleton, previously testified.[132]

Furthermore, Dr. Hanna has extensive experience in advanced computer vision and image processing technologies.[133] The combination of Dr. Hanna's expertise, his understanding of and opinions on the swarming approach and overdriving technique, his review of the adjacent photos, and identification of specific differences amount to more than speculation. Therefore, the Court concludes that Rule 702's requirements are satisfied as to Dr. Hanna's opinions on this issue.

---

[132] Hanna Reply Report ¶ 290, Dkt. No. 256-2.
[133] Hanna Opening Report ¶¶ 6–10, Dkt. No. 256-1.

Microsoft highlights the fact that during his deposition, Dr. Hanna testified that he did not look for artifacts in the image sensor to test the images.  Dr. Hanna was asked if there was "any image processing technical reason" that proves that the example photos were "taken by different camera systems?"[134]  Dr. Hanna responded "[s]o in the resolution of the images that are here, it would be useful to look for artifacts in the image sensor.  That would be a very useful thing to do.  I did not do that analysis, but that would be one way to find out is to look for, for example, defects in the image sensor.  But I did not do that analysis.  I was not asked to opine on that part.  But that would be an interesting thing to do.  So I can't say one way or the other."[135]  That Dr. Hanna did not test the photos using a particular method does not on its own render his opinion unreliable and if there were other suitable ways of arriving at his conclusion, Microsoft can raise those during cross-examination.  Accordingly, Microsoft's motion to exclude Dr. Hanna's conclusion that the particular images in paragraphs 291-96 were captured by different UCM camera systems is denied.

Microsoft further seeks to exclude paragraphs 291-296 because the example was not disclosed during discovery nor in Dr. Hanna's opening report on infringement.  This argument is based on an assumption that the Pennsylvania example described above is the *only* example Kewazinga has for its infringement theory that the Streetside systems mixes two sequential images (from one source bubble and one destination bubble) and presents that mixed image to users during the bubble-to-bubble transition.  Dr. Hanna's infringement opinions about mixed imagery captured by different UCM systems were disclosed in his opening report.  The example was provided in response to Dr. Forsyth's comment that Dr. Hanna failed to provide any examples of images captured by different cars and are not new

---

[134]Ex. 3 to Microsoft's Mot. ("Hanna Deposition") at 50:5–9.
[135] *Id.* at 50:12–25.

theories or methodologies that would require earlier disclosure.  The Court expects that

Microsoft will press Dr. Hanna on the existence of any other examples on cross-

examination.  Accordingly, Microsoft's motion to exclude Dr. Hanna's opinions on this basis

is denied.

### 3.    Dr. Hanna's Opinions on Kewazinga's Proposed Amended Contentions on "Array of Cameras."

Microsoft seeks to exclude Dr. Hanna's opinions on infringement theories outside the scope

of Kewazinga's contentions.[136]  By way of background, Kewazinga previously moved to amend its

infringement contentions to add new theories for demonstrating that an "array of cameras" was

used, including theories based on a camera trigger rate and collecting and processing GPS

information to determine the locations of the image capture points.[137]  Specifically, Kewazinga

asserted that its proposed amended arose from new, non-public information that made "clear the

extent to which Microsoft focused on and understood this fixed relationship, testifying that the

camera locations are known and that there is a 'spacial [sic] relationship' between sequential image

capture points."[138]  The Court denied the request as untimely, and further noted that the deposition

excerpts cited by Kewazinga did not support the assertion.[139]  As the Court explained, "[the

deponent] *never stated that these points are fixed* and provide 'discrete, sequential points' by which a

capture sequence is later initialized.  [Another deponent], similarly, described the GPS information

as capturing 'where the camera or the car was when the capture events were triggered'— *not*

*information dictating the initialization of a capture sequence*."[140]  This analysis refutes Kewazinga's present

argument that Microsoft's motion should be denied because the Court only excluded a proposed

---

[136] Microsoft's Mot. at 9.
[137] Dkt. No. 121.
[138] Dkt. No. 150 at 7:23–8:3.
[139] *Id.* at 8:4–25.
[140] *Id.* at 8:12–17.

amendment based on an ex-post look at whether there is a fixed relationship between image capture

points.  Kewazinga further argues that the DMI trigger theory is an expansion of its previous

contention based on the capturing of images at discrete, sequential points.  But Kewazinga raised

this same argument during the hearing on its motion to amend and it was rejected by the Court.[141]

Permitting Dr. Hanna to opine on whether a fixed relationship is created by virtue of the

trigger function would advance a theory that has already been rejected by the Court as untimely.

Because Dr. Hanna's opinions impermissibly "introduce new infringement theories" the Court will

exclude them.[142]  Permitting Dr. Hanna to testify on infringement theories outside the scope of

Kewazinga's contentions would be prejudicial to Microsoft, confusing to the jury, and highly

irrelevant.

The exceptions to this ruling are Dr. Hanna's opinions at in his report at ¶¶ 96–97, which

merely explain the image gathering process and do not, on their own, analyze how those processes

should be viewed in light of Kewazinga's infringement contentions.  Accordingly, Microsoft's

request to exclude Dr. Hanna's opinions at Ex. 1 (Hanna Report), ¶¶ 299–301 (portions), 303–307,

308–309 (portions), 311 (portion); Ex. 6 (Hanna Reply, ¶¶ 68–71, 74, 75–77 (portions), 96–100,

---

[141] *See* Dkt. No. 148, 5–9 ("The Court:  The proposed amendment describes the fact that the capture happens based on a trigger rate, which I understand to be the rate at which images are captured as the car moves down a street."; "Mr. Desai: The trigger rate is based on separate set of instrumentation on the system, which I don't believe is specifically related to the GPS."); ("The Court:  Can you comment on the trigger rate aspect of the proposed amendment?  I think that that is just the time, but you suggest that it may be triggered by more than just time.  In other words, something other than just rate.  Can you comment on that further?  I want to make sure that I'm focused on the right aspect of the proposed modification."); ("Mr. Desai:  I believe some of this was described in the technical tutorial, but there is a space for the rates in the different versions of Streetside, and so that trigger rate may have changed in different iterations of Streetside. There was some instrumentation on the car, essentially like an odometer in some sense, that would trigger the cameras every certain amount that the wheels had rotated. I guess similar to an odometer, so the space or the distance traveled on the street."); ("Mr. Desai: I would like to touch on prejudice on this issue as a last point. There is no prejudice in this amendment, particularly because it is not a change to Kewazinga's infringement theory.").  After that discussion, the Court still denied Kewazinga's request to amend its contentions.  Dkt. No. 150, 7:10–13 ("First, language about the 'array of cameras.'  This amendment has not been pursued diligently. This is a new theory borne out of Kewazinga's review of the Court's claim construction opinion.").

[142] *See Verinata Health, Inc. v. Sequenom, Inc.*, 2014 WL 4100638, at *3 (N.D. Cal. Aug 20, 2014) (quoting *Asus Comput. Int'l v. Round Rock Rsch., LLC*, 2014 WL 1463609, at *1 (Apr. 11, 2014) (internal quotation marks omitted).

101–102 (portions), and 104 (portion), is granted and its request as to Ex. 1 (Hanna Report), ¶¶ 96–97, is denied.

### B.    Request to Exclude Portions of Ms. Riley's Opinions

Microsoft seeks to exclude portions of Ms. Riley's opinions as unreliable, arguing that because Ms. Riley failed to apportion her royalty base, that she selected and manipulated license agreements to arrive at an inflated royalty rate, that she failed to use reliable methods in determining and splitting profit to arrive at an overinflated royalty rate, and that she has improperly opined on Microsoft's intent.

### 1.    Ms. Riley's Apportionment Analysis

Microsoft seeks to exclude Ms. Riley's royalty base analysis because Ms. Riley allegedly failed to apportion damages between the patented and unpatented features of the accused product.  Ms. Riley calculated three royalty bases, one for each of the accused instrumentalities.  The subject of Microsoft's motion is the accused Streetside feature of Bing.com/Maps, which forms the majority of the damages at issue in this case.

Upon a showing of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[143]  "A 'reasonable royalty' derives from a hypothetical negotiation between the patentee and the infringer when the infringement began."[144]  "The objective of [a] reasonable royalty calculation is to determine the amount necessary to adequately compensate for an infringement."[145]

---

[143] 35 U.S.C. § 284.

[144] *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 868–69 (Fed. Cir. 2010) (citing *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995); *see also Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006) ("A reasonable royalty is the amount that 'a person, desiring to manufacture [, use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make [, use, or] sell the patented article, in the market, at a reasonable profit.") (quoting *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) (citations omitted)).

[145] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1109 (Fed. Cir. 1996).

One method of calculating damages is the entire-market-value-rule, which calculates a rate applied to the entire market value of an infringing product. The entire-market-value rule applies "only in those circumstances where the basis of customer demand for the infringing product is traceable to the infringing features of the product."[146]   However, "the entire market value rule [is] impermissible" where a plaintiff "fail[s] to present evidence showing the patented [features] drove demand for the" product.[147]   In such cases, courts have "generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'"[148]

When "an infringing product is a multi-component product with [both] patented and unpatented components, apportionment [is] required."[149]   "[I]n any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature."[150]   "The principle, applicable specifically to the choice of a royalty base, is that, where a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product."[151]   "When the accused technology does not make up the whole of the accused product, apportionment is required. The ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more."[152]   Accordingly:

---

[146] *In re Avaya, Inc.*, 602 B.R. 445, 459 (S.D.N.Y. 2019). *See, e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009) ("For the entire market value rule to apply, the patentee must prove that the patent-related feature is the basis for customer demand." (quoting *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995))) (quotation marks omitted).

[147] *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012).

[148] *Id.* at 67 (quoting *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283 (N.D.N.Y. 2009)).

[149] *Mentor Graphics Corp. v. EVE-USA, Inc.*, 870 F.3d 1298, 1299 (Fed. Cir. 2017) (Stoll, J., concurring in denial of rehearing en banc) (collecting cases).

[150] *LaserDynamics, Inc.*, 694 F.3d at 67–68.

[151] *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

[152] *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1301 (Fed. Cir. 2019) (internal quotations and alterations omitted).

> [A] jury must ultimately 'apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features' using 'reliable and tangible' evidence.  Logically, an economist could do this in various ways—by careful selection of the royalty base to reflect the value added by the patented feature, where that differentiation is possible; by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof.  The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.[153]

"[A] reasonable royalty analysis necessarily involves an element of approximation and uncertainty."[154]

Here, Ms. Riley apportioned down Bing.com's advertising revenue to the revenue earned by Streetside feature, but not down to the accused portions of Streetside.  Microsoft argues that Ms. Riley both started her analysis with an improper royalty base and that her analysis is flawed because she did not apportion as far down as she should have, rendering her opinions unreliable.  Ms. Riley clearly stated that she did not apportion between the patented and unpatented features.  Such an analysis is required by Federal Circuit law when the entire market value is not used, as in this case.  "Ordinarily, an entire-market-value royalty base is appropriate only when the patented feature creates the basis for customer demand or substantially creates the value of the component parts, and apportionment is required when an entire-market-value royalty base is inappropriate."[155]  Ms. Riley has testified here that she did not invoke the entire market value rule here and that she allocated Microsoft's advertising revenue to the smallest salable patent practicing unit, which she determined to be the Streetside feature.[156]  And yet, Ms. Riley did not apportion down to the unpatented features of Streetside, though she testified that she was aware that certain functions in Streetside were unpatented.  Kewazinga argues that Ms. Riley satisfied the apportionment

---

[153] *Ericsson, Inc.*, 773 F.3d at 1226 (internal citation omitted).
[154] *Lucent Techs., Inc.*, 1336 (quoting *Unisplay*, 69 F.3d at 517 (internal quotation marks and citation omitted).
[155] *Vectura Ltd. v. Glaxosmithkline LLC*, 981 F.3d 1030, 1040 (Fed. Cir. 2020) (citing *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)).
[156] Ex. 9 to Microsoft's Opp.  ("Riley Opening Report") ¶ 183.

requirement by adjusting the royalty rate, but she clearly stated during her deposition that she did not attempt to differentiate between the value related to the patented features and the value related to unpatented Streetside features.[157]

Instead, Ms. Riley testified that the identified unpatented features sat as "building blocks" under the patents-in-suit.[158]  This is consistent with Kewazinga's argument that Ms. Riley was only required to apportion to the SSPPU.  Nonetheless, the Federal Circuit has been clear that "if the smallest salable unit—or smallest identifiable technical component—contains non infringing features, additional apportionment is still required."[159]  The Federal Circuit explained that

> the requirement that a patentee identify damages associated with the smallest salable
> patent-practicing unit is simply a step toward meeting the requirement of
> apportionment.  Where the smallest salable unit is, in fact, a multi-component
> product containing several non-infringing features with no relation to the patented
> feature . . . the patentee must do more to estimate what portion of the value of that
> product is attributable to the patented technology.  To hold otherwise would
> permit the entire market value exception to swallow the rule of apportionment.[160]

Kewazinga argues that Ms. Riley was not required to further apportion between the patented and unpatented features of Streetside because the unpatented features do not have any relevant purpose or value without the patented features.  Ms. Riley testified in her deposition that she believed the unpatented features to be building blocks for the patented features.  However, the Federal Circuit has held that further apportionment is required even when the patented feature is "'viewed as valuable, important, or even essential.'"[161]  Accordingly, further apportionment was required to account for the value of the patented technology as compared to the value of the

---

[157] Dkt. No. 202-7 ("Riley Deposition") at 163–64.
[158] *Id.*
[159] *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018).
[160] *Virnetx, Inc.*, 767 F.3d at 1327–28; *see also Network Prot. Scis., LLC v. Fortinet, Inc.*, 2013 WL 5402089, at *7 (N.D. Cal. Sept. 26, 2013) ("When using a multi-component product as a royalty base, even if it is the smallest salable unit, a patentee must *still show* that the patented feature drives demand for the entire product.") (emphasis in original); *Golden Bridge Tech. v. Apple Inc.*, 2014 WL 2194501, at *6 (N.D. Cal. May 18, 2014) ("Even if the accused products were the smallest salable unit, this court has previously explained that, under the Circuit's case law, relying on the smallest salable unit does not relieve a patentee of the burden of apportioning the base.").
[161] *Finjan, Inc.*, 879 F.3d at 1311 (citing *Virnetx*, 767 F.3d at 1329).

unpatented features.  Because Ms. Riley failed to identify a properly apportioned royalty base that accounted for both the patented and unpatented features of Streetside, her testimony is unreliable and should be excluded.[162]

Microsoft also challenges Ms. Riley's conflation of Bing.com/Maps users and Bing.com/Maps "local search" users without justification.  The two are distinct groups, one being obviously broader than the other.  Ms. Riley has not explained why it is proper to assume that the two behaved in the same manner, nor has she provided any methodology to engage in answering that question.  The Court must ensure that Ms. Riley's expert testimony satisfies the requirements of Rule 702.  Without an explanation for her conclusion that the two groups are indistinguishable for her damages analysis, the Court cannot conclude that the methodology she used is reliable.

Microsoft also challenges the royalty base used in Ms. Riley's apportionment analysis and argues that Ms. Riley's reliance on an "ecosystem" theory of the Bing universe is unreliable, and an attempt to ignore the SSPPU.[163]  Microsoft instead insists that Ms. Riley's analysis should have begun with Bing.com/Maps, rather than Bing.com's advertising revenue as a whole.  In her expert report, Ms. Riley opined that Streetside brings value to the wider Bing ecosystem of products and services.  Specifically, she opines that "street-level images are strategic for the Bing Maps business because the feature offers unique local search functionality and helps the company achieve competitive parity with Google."[164]  Therefore, to determine the royalty base for Streetside, Ms. Riley began with the online revenue related to Bing.com, allocated the search revenue to local intent searches, then further apportioned that amount to the revenue contributed by Streetside by looking to Streetside user metrics.[165]  Although Microsoft argues that this ecosystem analysis is a shrouded

---

[162] *California Inst. of Tech. v. Hughes Commc'ns Inc.*, 2015 WL 11089496, at *6 (C.D. Cal. May 5, 2015).
[163] As an initial note, the parties agree that Streetside is the SSPPU of as Bing.com/Map and Bing Maps API. Microsoft's position is that Streetside is the SSPPU for the Windows Maps App, while Kewazinga argues that the SSPPU for the Windows 10 Operating Software is monthly active device count.
[164] Dkt. No. 249-5 ("Riley Report") ¶ 145.
[165] *Id.* ¶¶ 185–96.

attempt to use the entire-market-value-rule, it is evident from Ms. Riley's report that this is not true and that she did not apply the entire-market-value-rule.[166]  She clearly explains how she apportioned down to what she believed to be the smallest salable patent-practicing unit.[167]  Indeed, Microsoft has not presented any binding authority that would require the Court to preclude Ms. Riley from viewing the Bing universe of products and services as an ecosystem for purposes of her damages analysis, and Ms. Riley has provided an explanation of her decision to do so, citing to what she believes to be relevant documents and cases.  Ms. Riley's assessment of the importance of Streetside to the wider system of Bing-related products and services does not make her opinion unreliable.  Thus, assessment should go to the weight of her testimony, not render it inadmissable.[168]

### 2.   Ms. Riley's Market Approach Analysis

Here, Microsoft argues that the two license agreements relied upon by Ms. Riley to determine a reasonable royalty rate are neither economically nor technically comparable, and therefore they are not probative of the rate in this case.  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), mod. and aff'd, 446 F.2d 295 (2d Cir. 1971) provides a list of factors that may be considered in determining the reasonable royalty for a patent license.[169]  Factor 2 is "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit," and Factor 15 is "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement."[170]

Here, there are significant differences between the license agreements relied upon by Ms. Riley and this case.  Notably, in one agreement, Kewazinga is the licensee, not the licensor.  And in

---

[166] *Id.* ¶ 183.
[167] *Id.* ¶¶ 182–96.
[168] *See* Dkt. No. 252-20 at 112.
[169] 318 F. Supp. 1116 at 1120.
[170] *Id.*

the second, the parties agreed on a fixed fee, not a running royalty rate, as calculated by Ms. Riley. However, that does not necessarily mean that Ms. Riley's opinions as to the applicability of these agreements should be excluded.  Instead, Microsoft's challenges to the comparability of the license agreements and her interpretation of them would be raised more appropriately on cross-examination.[171]

### 3.     Ms. Riley's "Profit Split" Approach

Ms. Riley's approach assumes that under the hypothetical negotiation, Kewazinga would seek to obtain a reasonable portion of Microsoft's profits "as informed by the importance of Streetside to the ecosystem of Bing-related products and services."[172]  Microsoft takes issue with this approach because Ms. Riley failed to provide a reliable analysis to determine Microsoft's profits earned from its infringement and what a reasonable portion would be.  Through this argument, the issues with Ms. Riley's failure to apportion between the patented and unpatented features are again brought to the forefront.  Although Ms. Riley used profitability produced by Microsoft only for the accused *products*,[173] as discussed above, she did not account for other non-infringing features that may contribute to Microsoft's profitability, resulting in an overinflated result.

### 4.     Ms. Riley's Opinions on Microsoft's Intent

Microsoft seeks to exclude Ms. Riley's opinions on Microsoft's intent for the same reasons that Microsoft challenged Dr. Hanna's opinions on Microsoft's state of mind.[174]  Microsoft points the Court to certain paragraphs of Ms. Riley's reports that it wishes to exclude, but those citations

---

[171] *Kaufman v. Microsoft Corp.*, 2020 WL 209224, at *2 (S.D.N.Y. Jan. 14, 2020); *see also Open Text S.A. v. Box, Inc.*, 2015 WL 393858, at *5 (N.D. Cal. Jan. 29, 2015) (declining to exclude expert's testimony about licenses arising from settlement agreements where opponent "point[ed] to no evidence suggesting that the royalties associated with the settlement agreements were depressed because they were entered into in the context of litigation," "point[ed] to no other licenses that it claims are more comparable," and would be "free to grill [expert] at trial about these issues").
[172] Riley Report ¶ 204, Ex. 8 to Microsoft's Mot.
[173] *See* Ex. 7 to Kewazinga's Opp. ("Riley Reply Report") ¶¶ 90–97; Riley Opening Report, Ex. 6 to Kewazinga's Opp. ¶¶ 205–12.
[174] Microsoft's Mot. at 13.

appear to be incorrect.[175]   Accordingly, this request is denied without prejudice and Microsoft is directed to submit updated citations to the portions of Ms. Riley's reports it wishes to exclude no later than October 8, 2021.

### C.      Request to Exclude Mr. Smith's Opinions on "Local Search"

Microsoft argues that Kewazinga's damages theory focuses too much on "local search." Microsoft argues that the opinions of Mr. Smith, Kewazinga's "local search" expert, which include an estimate of the percentage of the internet search marketplace that constitute "local search" should be excluded under FRE 401, 403, and 702 because they are irrelevant, prejudicial, and not based on reliable methodology or sufficient facts.[176]   This argument runs parallel to Microsoft's argument that Ms. Riley's selection of the Bing.com advertising revenue and her related estimate of "local search" violate the apportionment mandate.  For the same reasons discussed above, Mr. Smith was required to apportion between the unpatented and patented features of Streetside in reaching his conclusion.  Mr. Smith's assessment of the importance attributed to the local search function does not relieve him of that burden.

The important question here is whether Mr. Smith's testimony on the importance of the local search function to the accused instrumentalities is reliable.  When assessing the foundation of an expert opinion, a district court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[177]   In Mr. Smith's expert report, he opines:

> 85.  It is my opinion that consumers would be far less likely to use the Bing search engine if it did not have a Map feature or if its Maps feature did not have the Streetside feature. Most users are likely to conduct a search with local intent at some point, and if the results do not satisfy their needs, then they will seek out alternatives.

> 86.  Overall, local search is an important segment of all search activity, and Maps functionality is a vital component of local search. For Microsoft's Bing search engine,

---

[175] *See id.* (referring to red underscores in the cited paragraphs, where there were none in those portions of the exhibits).
[176] *Id.* at 27.
[177] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Maps are table-stakes for remaining competitive, and Streetside is a key feature for Bing Maps.[178]

In reaching this conclusion, Mr. Smith relies on anecdotes, studies done by third-parties and competitors, the presence of investment on the local search feature by Microsoft and its competitors, and Microsoft's internal documents and testimony about how they viewed the importance of the local search feature. None of these sources provide a sound reliable method for assessing how the Streetside instrumentalities would be viewed by consumers without the local search features. Mr. Smith made no effort to discern how often a user affirmatively utilizes the local search feature when using Streetside. This highlights the absence of any economic and factual data necessary for a reliable assessment of the basis for customer demand. He has not offered any "sound economic proof of the nature of the market and likely outcomes" to support his conclusion that the local search feature was the basis for public demand of the products, such as customer surveys or interview asking customers why they selected Streetside.[179] Although specific studies are not required, Mr. Smith has not provided any reliable and tangible evidence to support his opinions about consumer views.

Mr. Smith's proposed testimony is the prototypical example of the "ipse dixit" of the expert; that is, a conclusion unsupported and unsubstantiated by any evidence or methodology. The flawed bases for his opinions highlight several logical fallacies in his opinions, ranging from speculation ("[i]t is quite likely that as local search functionality has improved over time, relative usage of local search may have also increased over time. Other local information sources have likewise degraded over time, so consumers could have been converting from sources like print yellow pages directories

---

[178] Dkt. No. 218-8 at ¶¶ 85–86.
[179] *Grain Processing Corp. v. American Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999); *see also Inventio A.G. v. Otis Elevator Co.*, 2011 WL 3359705, at *3–4 (S.D.N.Y. June 23, 2011) (precluding expert opinion on damages for failure to provide any evidence to support conclusion that the infringing feature drove public demand for the product).

and other sources over to using major search engines' local search tools"),[180] reliance on anecdotal evidence ("*[a]necdotally, I have heard of people* checking in advance to see if an area seems safe or well-kept, if a location has street parking . . . ."),[181] and drawing false equivalents ("[e]arlier, in 2012, Ed Parsons, the Geospatial Technologist at *Google* (essentially, Google's chief geographer) stated that 'about one in three'" or between 30-40% of searches at Google are local . . . While there has been ambiguity about attribution of implicit local searches, there has been some consistent degree of consensus since at least 2010 that the local search share is reasonably and quite conservatively considered to be 30% of all searches on average. I agree with this assessment, and understand searches with local intent to comprise at least 30% of all searches, as a conservative estimate.").[182] And the evidence relied on by Mr. Smith that does pertain specifically to Microsoft is also flawed because Microsoft's perceptions about the value of its product are not necessarily representative of consumer views, and its internal data about usage requires a logical leap to arrive at Mr. Smith's conclusion about the reasoning behind that use. As such, "[t]rained experts commonly extrapolate from existing data," in this case there "is simply too great an analytical gap between the data and the opinion proffered."[183]

Ultimately, Mr. Smith's testimony will not assist the trier of fact. Mr. Smith's opinions regarding what consumers would have done had the Bing search engine not had a Map feature or if the Maps feature did not have the Streetside feature are not based on sufficient facts as to be reliable, and are not founded upon a reliable methodology. There is a substantial risk that Mr. Smith's proposed testimony would be misleading to the jury, and that risk outweighs the probative value of his proposed testimony.

---

[180] Dkt. No. 218-8 ("Smith Report") ¶ 67.
[181] *Id.* ¶ 61 (emphasis added).
[182] *Id.* ¶ 69–70 (emphasis added).
[183] *Gen. Elec. Co.*, 522 U.S. at 146.

Therefore, Microsoft's motion to exclude the testimony of Mr. Smith is granted.

## V.      Conclusion

Accordingly, for the reasons stated above, Kewazinga's motion to exclude the testimony and opinions of Dr. Forsyth and Dr. Meyer is granted in part and denied in part.  Microsoft's motion to exclude portions of the testimony and opinions of Dr. Hanna and Ms. Riley, and the opinions of Mr. Smith, is granted in part and denied in part.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 193 and 203.

SO ORDERED.

Dated:   September 1, 2021
             New York, New York

_____
GREGORY H. WOODS
United States District Judge